Epps v. The State.

---

No. 12,084.

## Epps v. The State.

CRIMINAL LAW.—*Indictment.*—*Return of.*—Where it appears from the record that an indictment was, on a certain day, returned into open court by the grand jury, endorsed " a true bill " by their foreman, the return is sufficiently shown.

SAME.—*Motion to Quash.*—Where the record discloses enough to authorize the inference that the indictment was duly returned by a lawfully organized grand jury for the term at which it was presented, it is sufficient, in that respect, on a motion to quash.

SAME.—*Murder by Arsenic.*—*Quantity of Poison.*—In an indictment charg-

| 102 | 539 |
| 128 | 466 |
| 102 | 539 |
| 132 | 326 |
| 102 | 539 |
| 135 | 260 |
| 136 | 222 |
| 102 | 539 |
| 141 | 123 |
| 102 | 539 |
| 144 | 303 |
| 145 | 21 |
| 145 | 566 |
| 145 | 673 |
| 147 | 44 |
| 147 | 379 |
| 102 | 539 |
| 148 | 704 |
| 149 | 406 |
| 149 | 702 |
| 150 | 85 |
| 152 | 320 |
| 102 | 539 |
| 154 | 429 |
| 154 | 649 |
| 102 | 539 |
| 157 | 445 |
| 102 | 539 |
| 164 | 269 |

ing murder by the administration of arsenic, the precise amount of the arsenic is immaterial, if the facts charged show that it was the poison which caused the death.

SAME.—*Absence of Prisoner During Argument of Motion to Quash.*—It is not error to hear argument, on a motion to quash an indictment, in the absence of the prisoner. Section 1786, R. S. 1881, relates merely to the trial.

SAME.—*Arraignment.—Practice.*—A motion to quash, as well as a demurrer to an indictment, in regular order, precedes the arraignment.

SAME.— *Withdrawing Plea of Not Guilty.—Discretion of Court.*—In the absence of a showing of cause, the granting or withholding leave to withdraw a plea of not guilty rests in the discretion of the trial court.

SAME.—*Juror.—Examination of as to Qualifications.*—Much rests in the discretion of the trial court as to what questions may or may not be answered by a person called as a juror, touching his qualifications to serve, but great latitude ought to be allowed. See opinion.

SAME.—*Murder.—Proof that Deceased was Human Being.*—In a prosecution for murder it is unnecessary, but harmless to the accused, to prove that the deceased was a human being.

SAME.—*Accused's Statement as Witness at Coroner's Inquest.—Signature to.— Evidence.*—Where one, who is subsequently indicted for the murder of the deceased, voluntarily testifies as a witness at the coroner's inquest concerning the death of such deceased, it is his duty to attest his statement by his signature, and such statement, if it becomes relevant and material, may be read in evidence against him at his trial.

SAME.—*Evidence.*—The mere facts that such witness, after his statement was reduced to writing, asked an attorney for the prosecution, who was present at the inquest, if signing such statement would clear or criminate him, to which such attorney answered that he did not know, and he then signed without further hesitation, do not make such statement inadmissible as evidence, nor is it a material inquiry whether the attorney's answer was true or untrue.

SAME.—*Harmless Error.*—It is not available error to overrule questions propounded to a witness, which are merely collateral to the main question under investigation, and which can be either permitted or denied without material injury to any one.

SAME.—*Physician.—Opinion.— Credibility.*—A physician who attended the deceased in his last sickness, and who, as a witness at the trial, gives it as his opinion that the case was one of arsenical poisoning, may properly be asked if he had treated it as such, as a means of testing his credibility, but the refusal to permit the question is not necessarily a material error.

SAME.—*Medicine Administered by Physician.—Showing that it Contained no Poison.*—Where the physician administered bismuth to the deceased in

Epps *v.* The State.

his illness, and the question is made whether it might not have contained arsenic, he may testify that he afterward gave the same kind of bismuth to another patient without injury, and it may also be shown that a chemist, who analyzed bismuth from the same package, found no traces of arsenic in it.

SAME.—*Medical Books.*—Medical books are not admissible as evidence.

SAME.—*Expert.—Hypothetical Case.—Opinion Certain or Probable.*—Where a physician, testifying as an expert, expresses the opinion upon a hypothetical case, that the deceased came to his death by arsenical poison, he may properly be asked, in behalf of the accused, whether his conclusion is one of certainty or only of high probability, but the refusal of the court to permit the question may not be available error in the light of other expert testimony.

SAME.—*Misconduct of Counsel in Argument.*—For misconduct of counsel for the State in argument, held not sufficient to justify the reversal of the judgment, when considered in connection with interruptive denials of counsel for the accused and the prompt disapproval of the court, see opinion.

SAME.—*Instruction.—Death Within a Year and a Day.*—Where the evidence shows that the deceased died within a week after his symptoms of arsenical poisoning, it is unnecessary for the court, in stating the facts necessary to a conviction, to tell the jury that death must have resulted within a year and a day after the poison was administered.

SAME.—An instruction which is good as a whole can not be attacked in part.

SAME.—*Instruction as to Hypothetical Case.—Expert.*—An instruction, that the facts stated in a hypothetical case need not necessarily be always fully proven, to give value to the testimony of an expert, is substantially correct.

SAME.—*Circumstantial Evidence.*—An instruction, given in connection with proper illustrations and precautions, that the accused's guilt might be established by circumstantial evidence alone, is good.

SAME.—*Rejection of Evidence by Jury.*—An instruction, that testimony can only be rejected because it is not true, and that when the evidence is irreconcilably conflicting, that which is false must be rejected, is abstractly correct.

SAME.—*Instruction Must be Applicable to Evidence.*—Where an instruction is asked which is not applicable to the evidence, it will be properly refused.

SAME.—*Cumulative Instructions.*—It is not error to refuse instructions which are merely cumulative.

SAME.—*Misconduct of Jury.—Practice.*—Where the trial court hears evidence upon a question of misconduct of the jury, its decision on that question will not be disturbed by the Supreme Court on what may seem to be the weight of the evidence.

SAME.—*Technical Errors.*—Where the verdict is right upon the evidence, it will not be reversed for merely abstract and practically harmless errors.

From the Huntington Circuit Court.

*A. Moore, L. P. Boyle* and *Z. Dungan,* for appellant.

*F. T. Hord,* Attorney General, *C. W. Watkins* and *J. C. Branyan,* for the State.

NIBLACK, J.—The appellant, Charlotte Epps, was indicted, tried and convicted for the murder of her husband, John Epps, and sentenced to imprisonment for life.

Though somewhat informally expressed, the record before us shows that the indictment in this case, known then as number 299, was, on the 4th judicial day of the October term, 1883, of the Huntington Circuit Court, returned into open court by the grand jury of Huntington county, endorsed "a true bill" by their foreman, and that was enough to show a proper return of the indictment. *Heath* v. *State,* 101 Ind. 512.

The indictment was in three counts, each charging murder in the first degree by means of arsenical poison. The first count, after making the usual and formal preliminary recitals, charged the appellant with having, on the 6th day of June, 1883, killed and murdered the deceased by unlawfully, feloniously, wilfully and maliciously administering "to him, the said John Epps, a certain deadly poison, to wit, a poison commonly called arsenic, which he, the said John Epps, then and there received at the hands of her, the said Charlotte Epps, and which he, the said John Epps, then and there swallowed, and by reason of which he, the said John Epps, then and there and thereby died," etc. The other counts charged substantially the same offence, but not precisely in the same language. In neither was it averred what amount of arsenic was administered to the deceased.

The appellant moved to quash the indictment, first, because the record did not set out the names of the grand jurors who returned the indictment, or show the term for

which such grand jury was empanelled, and did not make it appear affirmatively that the person who endorsed the indictment as "a true bill" was in fact the grand jury's "foreman" as he purported to be, and, secondly, because the amount of arsenic alleged to have been administered was not averred, upon the ground that it was necessary to show that the amount used was sufficient to produce death. The motion to quash was nevertheless overruled, and in that respect no error is apparent. The record discloses enough to authorize the inference that the indictment was duly returned by a lawfully organized grand jury for the term at which it was presented. Moore Crim. Law, section 472; *Powers* v. *State*, 87 Ind. 144; *Heath* v. *State*, 101 Ind. 512.

The further inference from the facts charged in each count of the indictment necessarily was, that it was the arsenic administered to the deceased which caused his death, and, in that view, the precise amount so administered was quite immaterial. *Snyder* v. *State*, 59 Ind. 105.

The circuit court heard a part of the argument upon the motion to quash the indictment in the absence of the appellant, but she was present when the argument was concluded and when the motion to quash was overruled. It is claimed that thus hearing part of the argument, when the appellant was not present, was erroneous, and an elaborate argument has been submitted in support of that claim. Section 1786, R. S. 1881, provides that "No person prosecuted for any offence punishable by death, or by confinement in the State prison or county jail, shall be tried unless personally present during the trial." But this section does not have any relation to motions in a cause, not connected with the trial, and can not in any event be held to require the presence of a prisoner during the argument of a motion merely preliminary to or preceding the trial.

After a demurrer to the indictment had also been overruled, the appellant was arraigned and entered a plea of not guilty to the charge preferred against her.

Afterwards the appellant asked leave to withdraw her plea of not guilty for the purpose of enabling her to again move to quash the indictment upon the alleged ground that the previous motion to quash had been made before arraignment, and hence prematurely made, but the circuit court overruled her application, and that is also claimed to have been erroneous.

By section 1762, R. S. 1881, it is enacted that "If the motion to quash be overruled, the defendant shall be arraigned by the reading of the indictment or information to him by the clerk, unless he waive the reading; and he shall then be required to plead immediately thereto," unless further time be given to answer. This section makes it plain that a motion to quash, as well as a demurrer to an indictment, in regular order, precedes the arraignment. No cause was, therefore, shown for the withdrawal of the appellant's plea to the indictment, and, in the absence of the showing of any such cause, the granting or withholding leave to her to withdraw her plea rested entirely within the discretion of the circuit court.

One William Fall was called to serve as a juror in the cause, and upon being sworn to answer as to his qualifications to serve in that capacity, answered as follows: "I am a voter and householder of Huntington county, Indiana. I have no particular opinion of the guilt or innocence of the defendant. I have an opinion of it formed from what I have learned of the case from rumor or hearsay, and from reading about it, but don't know whether what I read was the evidence of the case or not." Counsel for the appellant thereupon asked Fall, "When you have an opinion on any subject does it take much evidence to remove it?" The circuit court sustained an objection to that question, and refused to permit it to be answered, to which an exception was reserved. Without any further evidence as to his competency, or objection from, or further exception by, the appellant, Fall was admitted and sworn, and served as a juror in the cause.

One John Martz was also called to serve as a juror, and upon being sworn said: "I am a voter and householder of Huntington county, Indiana, and (have) not formed or expressed any opinion of the guilt or innocence of the defendant." Counsel for the defendant then propounded to Martz the following questions: "You would not guess the defendant into the penitentiary, or to hanging her, would you?" "What, if anything, have you read of the case?" "You would not convict the defendant of the charge against her to please or displease anybody, would you?" Objections were made and severally sustained to these questions, whereupon the appellant peremptorily challenged Martz, and he was, consequently, not permitted to serve on the jury.

It may be said generally, that the extent to which a party should be allowed to go in the examination of a person called as a juror is not, in this State, and can not well be, governed by any fixed rules. Much rests in the discretion of the court as to what questions may or may not be answered, but in practice very great latitude is, and generally ought to be, indulged.

The question asked of Fall had no direct application to the question then before the court, which was as to the extent and the circumstances under which he had formed an opinion; hence it was not error to sustain an objection to the question. The court ought, perhaps, to have required more evidence to sustain the juror's impartiality, but as the juror was admitted and sworn, without objection from the appellant, no question was reserved upon the omission of the circuit court in that respect.

The second question addressed to Martz might, with propriety, have been permitted, but as he had already answered that he had neither formed nor expressed an opinion as to the guilt or innocence of the appellant, and as no other question had been made upon his competency as a juror, there was seemingly nothing else remaining to which his proposed further

examination had any material reference.   It is, at all events, not apparent that the circuit court was guilty of any abuse of its discretion in sustaining objections to all of the questions propounded to Martz.

James C. Branyan, an attorney of the Huntington Circuit Court, assisted in the prosecution of this cause, and was also examined as a witness on behalf of the State.   He testified to having been present at the inquest held upon the body of John Epps, and to the fact that the appellant was examined as a witness at the inquest; also, that the testimony given by her upon the occasion was reduced to writing by a person designated for that purpose.   He furthermore stated that when the testimony of the appellant, as it was written out, was read over to her, he told her she was at liberty to sign the paper thus read to her, or not, as she chose, that there was no power which could compel her to sign it if she did not wish to do so; that the appellant then asked him, if signing it would "clear" her of the charge that she had probably had something to do with the death of her then deceased husband, or whether it might not criminate her; that he told her that as to that he did not know; that she thereupon, without apparent further hesitation, signed the paper in question. Counsel for the appellant then inquired of Mr. Branyan whether, at the time he told the appellant that he did not know whether her signing the statement she had made before the coroner would or would not "clear" her, or might or might not criminate her, he did not tell her what was untrue, and what he knew at the time to be untrue.   The court sustained an objection to that question, and did not require the witness to answer it, and it is argued that thereby a palpable error was committed.

At the time the appellant made her statement before the coroner, there was no formal accusation against her, and she testified only as a witness in common with other witnesses, concerning the death of John Epps.   In such a case, the law required that her testimony should be reduced to writing, and

subscribed by her, and returned to the clerk of the circuit court with other papers pertaining to the inquest. R. S. 1881, section 5880; *Woods* v. *State*, 63 Ind. 353. After she consented to testify, it became her duty to attest what she had stated by her signature, and as what Mr. Branyan said to her after her testimony was reduced to writing seemingly tended neither to encourage nor to discourage her from subscribing to her statement, his motive in saying what he did added nothing either to the validity or invalidity of her signature, and hence the proposed inquiry as to the truth of what he told her at the time was wholly immaterial. If she had declined to sign her statement, after it had been made and written out, it might have been still used against her in the event that it became relevant and material. 1 Greenl. Ev., section 228.

The appellant's statement made before the coroner was read in evidence, over her objection, and that is made a cause of complaint, in argument here, upon the ground that she was misled by Mr. Branyan, as herein above stated, and that the circuit court erroneously refused to permit him, Branyan, to answer as to the truth of his representations made to her. What we have already said practically disposes of this cause of complaint. But it may be said in addition that there was no pretence that any inducement or threats had been used to obtain a statement from the appellant at the inquest, and that all that is objected to on the part of Mr. Branyan occurred in relation to the signature merely after her statement had been made and committed to writing. Conceding, therefore, that Mr. Branyan was guilty of all that the last question put to him implied, there was still no reason for not admitting the appellant's statement in evidence.

One Baker Pickens was a witness for the State, and testified to having been frequently at and about the house of John Epps during his last sickness, but denied having taken very much interest in the case. Counsel for the appellant then asked him "How did you come to be present when the

will was probated to find out what was in it?" One Thomas
Barker testified to having been at the funeral of John Epps
as well as the inquest; also to the fact that two *post mortem*
examinations were made of the body.    Counsel for appellant
then inquired whether it was not the general talk at the time
in the neighborhood, that John Epps's body contained arsenic?
These questions were both overruled, and we see no error in
these rulings of the circuit court.    Both questions were col-
lateral merely to the main question under investigation, and
were of that class which might have been either permitted or
denied without material injury to any one.

Dr. James F. Mock attended upon the deceased during his
last sickness, and as a witness described the symptoms which
were developed from time to time.    He also gave the names
of the different medicines which he administered to the de-
ceased in his treatment of the case.    While entertaining some
doubt at first, he expressed the opinion that the case proved
to be one of arsenical poisoning.    Counsel for the appellant
then inquired whether he had treated the case as one of arsen-
ical poisoning, but the court refused to allow the question
to be answered.    We think the question was one which ought
in strictness to have been permitted, as a means of testing
the credibility of the witness, but the information sought by
it had only an incidental relation to what was then the subject
of inquiry, that is to say, whether the case was really one of
poisoning by arsenic, and hence we regard the error com-
mitted by the exclusion of the question as not essentially
material.

One Dr. Lomax was examined as an expert, and, upon a
hypothetical case put to him, expressed the opinion that the
deceased came to his death by arsenical poison.    Counsel for
the appellant thereupon inquired whether the conclusion thus
reached by the witness was one of certainty or only of high
probability, but the court declined to allow such an inquiry
to be made.    We esteem that as having been, under all the
circumstances, both a pertinent and a proper question, but the

subject-matter involved was so thoroughly and elaborately discussed and reviewed by other witnesses who testified as experts in the cause, that we feel justified in assuming that no serious injury was inflicted upon the appellant by the exclusion of that question.

It was made to appear by the evidence that Dr. Mock administered bismuth to the deceased during his illness, and the question was made whether bismuth does not frequently contain traces of arsenic, and whether the bismuth so administered might not have been impregnated with arsenic. Dr. Mock was, as bearing upon that question, allowed to testify that he afterwards administered the same kind of bismuth to another patient without any injurious effect, and that he afterwards purchased some more bismuth from the same package and sent it to Dr. Dreyer, a chemist at Fort Wayne, to be analyzed. Dr. Dreyer was then permitted to state that he analyzed the bismuth sent to him by Dr. Mock and found no traces of arsenic in it. All that occurred about the bismuth, after the death of John Epps, was over the objection of the appellant, but the evidence in that respect tended to show that the bismuth administered to Epps was free from arsenic, and was hence material and proper.

The State was permitted to prove that John Epps was a human being. That was unnecessary, but evidently did the appellant no harm. *Merrick* v. *State*, 63 Ind. 327.

The appellant offered to read in evidence two pages from a book known as "Taylor on Poison," which refers to the impure condition in which bismuth is often found. It was admitted that the book was a standard work on the subject to which it relates, but it was nevertheless held to be inadmissible in evidence. Counsel for the appellant admit that the book was inadmissible according to previous decisions of this court, but maintain that these previous decisions are against reason and an enlightened view of public justice. It is true, that the line of cases on the subject of the non-admissibility of medical works and other books of science, of

which our cases form a part, has been criticised, and, at times, commented upon unfavorably, but the rule established by these cases has never, to our knowledge, been seriously encroached upon, and nevertheless continues to be generally maintained. No sufficient reason has been suggested, as we believe, for a departure from that rule in the present case. See 1 Greenl. Ev., section 497, and note; *Carter* v. *State*, 2 Ind. 617; *Longnecker* v. *State*, 22 Ind. 247. As having some relation to the same subject, see the cases of *Cory* v. *Silcox*, 6 Ind. 39; *Baldwin* v. *Bricker*, 86 Ind. 221; *Jones* v. *Angell*, 95 Ind. 376.

One of the attorneys for the State, in his closing argument, while commenting upon the propriety of convicting upon circumstantial evidence alone, exclaimed: "Why a man was hung at Fort Wayne, in an adjoining county, on circumstantial evidence not one hundredth part as strong as the evidence in this case against Mrs. Epps." These remarks were objected to by one of the counsel for the appellant, who interruptingly said that while he was not familiar with the facts of the case referred to, "he knew that in that case the fruits of the crime had been traced to a pawn-shop." The court thereupon admonished the attorney for the State that he must confine himself to the evidence in his statements to the jury, to which the attorney with much earnestness replied: "I know what I am saying, and I do not want to be interrupted in my argument; it throws me off my line of argument."

On the day before John Epps was taken sick, one Clinton Orndoff, the son-in-law of the appellant, accompanied her, as also did his wife, to the city of Huntington, three miles from their homes.

Orndorff testified that while in the city the appellant gave him five cents to buy some arsenic, avowedly to kill rats and mice; that he bought five cents' worth of arsenic, as requested, and gave it to her in Weaver's store, telling her at the same time, "Here is the arsenic; it is poison; be careful;" that

the appellant took the package and said "All right; I have handled that before."

The attorney for the State, above referred to, in commenting upon this evidence, said, in substance, " This woman" (pointing to the appellant) " took poison from Clinton Orndorff in Weaver's store and said, ' I know what it is ; I know it's poison ; I've handled it before ; I've buried two husbands and children.' "

Counsel for the appellant again objected, and the court again admonished the attorney for the State that he must keep within the evidence, whereupon that attorney responded : " I don't mean that she" (the appellant) " said it all in Weaver's store; I mean to say that she said in Weaver's store that she knew it was poison, and had handled it before, and that it was a fact that she had buried two husbands and children, but I disclaim any intention to say that she testified to " (these facts) " all in the same connection in the store."

There was evidence tending to prove that the appellant was a widow when she married John Epps, and that she was at the time the mother of two sets of children, from which the inference that she had been twice previously married was not unreasonable, and might, therefore, be assumed.

One Edward Mise was a witness at the trial, and testified primarily on behalf of the State. He was a half-brother of John Epps, and, being unmarried, had lived with him for many years and up to the time of his death. The attorney for the State, continuing his argument, said : " Oh ! gentlemen of the jury, if I could tell you what that good old man, Edward Mise" (pointing to him), " told me he knows about other dark things surrounding this case, it would clear away much of the mystery about it, about which counsel for defence talk so much." Counsel for the appellant again objected, and the court directed the attorney for the State to suspend his argument, but he declined to heed the admonition of the court, and proceeded with his address to the jury.

It was a conceded matter at the trial that Mr. Moore, one of

the appellant's counsel, had formerly resided in Huntington county, but was then a resident of the city of Chicago, and, in the examination of some of the witnesses, a question was made whether the appellant had not employed Mr. Moore in her defence before she was either arrested or formally charged with the murder of her husband.

In commenting upon the appellant's alleged consciousness of guilt, the attorney for the State, further continuing, charged that "she" (pointing to the accused) "sent to Chicago for Mr. Moore, a criminal lawyer, before she was charged with the crime, and employed him to defend her," intimating that her conduct in that regard afforded another illustration of the truth of the scriptural adage that "The wicked flee when no man pursueth." To this counsel for the appellant also objected, but the attorney for the State again refused to suspend, and continued his argument to the jury.

The attorney for the State evidently went beyond the limits of legitimate debate in some of his statements to the jury, and palpably so in his allusion to what Edward Mise had told him. He also made himself amenable to the circuit court for a contempt of its authority. But, when taken in connection with the interruptive denials and interjections of counsel for the appellant, and the prompt disapproval in each instance by the court, we would not feel justified in holding that the misconduct of the attorney for the State was so gross as to require the reversal of the judgment against the appellant. *St. Louis, etc., R. W. Co.* v. *Myrtle*, 51 Ind. 566; *Kinnaman* v. *Kinnaman*, 71 Ind. 417; *Combs* v. *State*, 75 Ind. 215; *Rudolph* v. *Landwerlen*, 92 Ind. 34. Such misconduct in argument, as that complained of as above, stands upon a different footing from comments upon the failure of a defendant to testify in his own behalf, since such comments are in violation of the express provision of a statute. R. S. 1881, section 1798.

In one of its instructions, the circuit court told the jury that "It is essential to the conviction of the defendant that

the following facts must be proven beyond a reasonable doubt, to wit: 1st. The death of John Epps, named in the indictment. 2d. That his death was caused by, or was mediately or immediately accelerated by poison by arsenic. 3d. That the poison thus causing or accelerating the death of John Epps was feloniously administered by the defendant to him, or that the defendant feloniously participated in such administration thereof, or feloniously caused the same to be administered to him. 4th. That the offence was committed in Huntington county, in the State of Indiana."

It is objected that this instruction did not, also, tell the jury that death must have resulted within a year and a day after the poison was administered. In the first place, we see nothing in the instruction, so far as it purported to go, which could have injured the appellant. In the next place, there was no evidence which required the additional definition insisted upon. The last sickness of John Epps, immediately following his symptoms of arsenical poisoning, was of less than a week's duration.

The court further instructed the jury that "The opinions of the experts are to be considered by you in connection with all the other evidence in the case. You are not to act upon them to the *entire* exclusion of other testimony. You are to apply the same general rules to the testimony of experts that are applicable to the testimony of other witnesses in determining its weight, taking into consideration the opinions of the experts, and giving them just weight, you are to determine for yourselves, from the whole evidence, whether the defendant is guilty as she stands charged, beyond a reasonable doubt."

It is complained that this instruction told the jury, in effect, that they might consider the testimony of the experts to the *partial* exclusion of other evidence, and that it was error to so instruct the jury. It does not necessarily follow that the instruction was erroneous, conceding the construction of it contended for. But, however that may be, we see no objec-

tion to the instruction as a whole, and can only regard the criticism made upon it as an impracticable one.   *Goodwin* v. *State*, 96 Ind. 550.

The next instruction told the jury, in brief, that the facts stated in a hypothetical case need not necessarily be always fully proven, to give value to the testimony of an expert, and that instruction is substantially supported by the case of *Eggers* v. *Eggers*, 57 Ind. 461.

A subsequent instruction told the jury, in connection with such illustrations and precautions as are usual in such cases, in substance, that the appellant's guilt might be established by circumstantial evidence alone.   That doctrine is too well sustained by the authorities to require any extended comment upon it.   See 1 Greenl. Ev., section 13 and 13*a* ;   Moore Crim. Law, sections 344, 397.

Two other instructions taken together announced the doctrine that testimony could only be rejected because it was not true, and that when the evidence is irreconcilably conflicting, that which is false must be rejected.   This doctrine is oftentimes very difficult of application, but it is doubtless the law when abstractly considered, and we are unable to see that there was anything in either one of these last-named instructions presumably injurious to the appellant.

The appellant asked the court to instruct the jury that " If the proof shows positively that one of two or more persons committed the homicide set out in the indictment, but leaves it uncertain which of them in fact committed the act which caused the death, all such persons must be acquitted, unless it was committed by one of them under circumstances which in law makes the other equally guilty."   That instruction was refused, and that refusal is relied upon as clearly and positively erroneous.   As applicable to an appropriate state of facts, the instruction states the law correctly, but there was nothing in the evidence in this case to which it could have had any practical application.   There was nothing in the evidence which tended even remotely to implicate any one else

besides the appellant. *Hubbard* v. *State*, 72 Ala. 164. Either she was guilty, or the whole case remained a profound and impenetrable mystery.

The deceased had symptoms of arsenical poisoning two days before a physician was called, and before any medicine, whether pure or impure, was administered to him. The medicines thereafter prescribed for the deceased were fully explained and accounted for. The instruction was, therefore, correctly refused.

Other instructions were asked by the appellant and refused by the court, but the substance of them had, as we believe, already been given by the court upon its own motion, in some other form, and there was hence no error in refusing merely cumulative instructions. At all events, the jury appear to us to have been fully and carefully instructed upon all the material matters to which their attention was especially required, thus rendering further instructions unnecessary.

Misconduct on the part of the jury was also charged as a cause for a new trial. In support of this charge, affidavits were filed stating that two or three of the jurors were, during the progress of the trial, permitted by their bailiff to walk from the rear of the court-house across the court-house lot, where other people were standing and walking to and fro, a distance of one hundred and fifty or two hundred feet, to a public closet, and return without being accompanied by him ; also asserting that one evening, after court had adjourned, the jury were found walking around in the court-house in a more or less dispersed condition amongst a crowd of people who had been attending court, under the pretext of taking some exercise. Counter-affidavits were also filed, either expressly or inferentially, denying the alleged misconduct charged. Upon the issue thus presented the circuit court decided that the charges of misconduct on the part of some of the jurors, as well as the entire jury, were not sustained.

It has been held by this court, that where a motion for a new trial is based upon alleged misconduct of the jury, or

of certain jurors, and the court has heard evidence, whether presented orally or by affidavit, concerning such alleged misconduct, the conclusion reached will not be disturbed by this court upon what may seem to be the weight of the evidence, and that may now be regarded as a well established rule of practice in this State. *Long* v. *State,* 95 Ind. 481.

It is claimed, finally, that the verdict was not sustained by sufficient evidence, and that for that reason, if for no other, the judgment ought to be reversed.

It is true, that everything which served to connect the appellant with the death of John Epps rested upon circumstantial evidence, and that the circumstances were not absolutely conclusive against the appellant, yet upon the whole evidence we see no palpable reason for doubting her guilt. The evidence tended to establish beyond all question that the deceased died from arsenical poisoning, produced by the administration of small or divided doses of arsenic; that the deceased was taken sick, with symptoms indicating the presence of arsenic in his stomach, the day after the appellant purchased arsenic as herein above stated; that the appellant cooked the deceased's breakfast and served it to him the morning he was taken sick; that she administered food and medicine to him during his sickness, having opportunities in that respect which no one else enjoyed; that she at first denied having purchased any arsenic the day before her husband was taken sick, and when confronted with the fact that she had done so, she was unable to give any account of what became of the arsenic. There were other circumstances unfavorable to the appellant which it is impracticable to set out at length. The judgment can not, therefore, be reversed upon the evidence.

As affecting criminal causes, section 1891, R. S. 1881, enacts that, "In the consideration of the questions which are presented upon an appeal, the Supreme Court shall not regard technical errors or defects or exceptions to any decision or action of the court below, which did not, in the opinion

of the Supreme Court, prejudice the substantial rights of the defendant." We construe technical errors to include in this connection merely abstract and practically harmless errors. While, therefore, we agree that some errors and irregularities intervened during the progress of the cause as herein above indicated, we regard these errors and irregularities as not having probably had any perceptible effect upon the result of the trial, and as the verdict was seemingly and in every reasonable view probably right upon the evidence, no sufficient reason has been shown for a reversal of the judgment. *Smith* v. *State,* 28 Ind. 321; *Rollins* v. *State,* 62 Ind. 46; *Binns* v. *State,* 66 Ind. 428.

The judgment is affirmed, with costs.

Filed June 10, 1885; petition for a rehearing overruled Nov. 7, 1885.